RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

AMERICAN CIVIL LIBERTIES UNION OF
MICHIGAN,

                        *Plaintiff-Appellant*,

        *v.*

FEDERAL BUREAU OF INVESTIGATION;
UNITED STATES DEPARTMENT OF JUSTICE,

                        *Defendants-Appellees*.

No. 12-2536

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-13154—Lawrence P. Zatkoff, District Judge.

Argued: July 24, 2013

Decided and Filed: August 21, 2013

Before: BOGGS and McKEAGUE, Circuit Judges; BECKWITH, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Nusrat J. Choudhury, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellant. Catherine H. Dorsey, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Nusrat J. Choudhury, Hina Shamsi, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Mark P. Fancher, Michael J. Steinberg, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Stephen C. Borgsdorf, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellant. Catherine H. Dorsey, Matthew M. Collette, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

[*]The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**OPINION**

---

BOGGS, Circuit Judge.   This case involves a Freedom of Information Act (FOIA) request by the American Civil Liberties Union of Michigan (ACLU), which seeks release of information from the FBI about the agency's use of community-level racial and ethnic demographic data.  The ACLU appeals the district court's holding that the FBI appropriately withheld records under Exemption 7(A), which deals with law enforcement information whose release could "interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  In particular, the ACLU argues that because racial and ethnic demographic data are public information—and because FBI policy prohibits use of such information as the "dominant" or "primary" basis for investigations—disclosure could not harm ongoing law-enforcement proceedings.  In addition, the ACLU objects to the district court's refusal to engage in a public proceeding to determine whether the FBI was impermissibly relying on the FOIA's exclusion provisions, which permit an agency to treat certain records as "not subject to the requirements" of the FOIA.  5 U.S.C. § 552(c).  Because release of publicly available information selectively used in investigations may reveal law-enforcement priorities and methodologies and thus interfere with enforcement proceedings, the FBI properly applied Exemption 7(A). Additionally, the ACLU's proposed procedure for resolving § 552(c) disputes is unnecessary and inadequately protective of sensitive information; *in camera* review by the district court is appropriate instead.  We affirm the judgment of the district court.

**I**

In 2008, the FBI issued a "Domestic Investigations and Operations Guide" (DIOG) to implement newly revised guidelines from the Department of Justice.  Among other matters, the DIOG addressed the FBI's use of race and ethnic identity in assessments and investigations.  Under this guidance, the FBI may 1) identify and map "locations of concentrated ethnic communities" if such locations "will reasonably aid the analysis of potential threats and vulnerabilities, and, overall assist domain

awareness," and 2) collect "[f]ocused behavioral characteristics reasonably believed to be associated with a particular criminal or terrorist element of an ethnic community."

Concerned that these guidelines loosened restrictions on FBI authority and risked leading to illegal profiling of communities, in 2010 the ACLU submitted a FOIA request to the FBI's Detroit Field Office. The request sought release of documents "concerning the FBI's implementation of its authority to collect information about and 'map' racial and ethnic demographics, 'behaviors,' and 'life style characteristics' in local communities" in Michigan. In particular, the ACLU requested records since December 2007 concerning FBI policy on collecting (or not collecting) such information, and records since December 2008 containing the information actually collected.

The FBI initially released 298 pages (48 partially redacted) of training material that had been previously released pursuant to a similar request by the ACLU's Atlanta affiliate. While the FBI was reviewing additional materials, the ACLU brought this suit on July 21, 2011. Ultimately, after three more releases, the FBI had identified 1,553 pages of potentially responsive records. 356 pages were released in full or in part and 190 were withheld as duplicates. The responsive documents consisted of five types: 1) training materials, 2) "domain intelligence notes," 3) "program assessments," 4) "electronic communications," and 5) maps. A domain intelligence note contains data and analysis on a "particular group or element" in the "domain," or area of responsibility for the field office. A program assessment compiles the results of a "large number" of domain intelligence notes and other research for a higher-level view of threats, vulnerabilities, and capabilities. Electronic communications "document the intelligence analysis and work product" underlying program assessments and domain intelligence notes. Maps are stand-alone visualizations of the intelligence data collected by the analyst.

On February 17, 2012, the FBI moved for summary judgment, supporting its motion with a declaration by David Hardy, Section Chief of the Record/Information

Dissemination Section, and a descriptive *Vaughn* index[1] of the potentially responsive documents. The declaration explained in detail which FOIA exemptions were applied to withhold each document, and the basis for applying that exception. Although most documents were exempted on multiple grounds, the FBI primarily relied on Exemption 7(A), which protects law-enforcement records whose disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The declaration explained that the withheld documents contained current intelligence information being used in current, ongoing, and prospective investigations, and that release would interfere with investigation and prosecution of cases. Specifically, release would inform criminal elements of FBI strategy, classified techniques, and analytic processes, and permit circumvention and evasion of FBI investigation and enforcement.

In many cases, the FBI also relied on Exemption 1, which protects properly classified records kept secret in the interest of national defense or foreign policy. 5 U.S.C. § 552(b)(1). The declaration asserted that disclosure of classified material in the requested documents would allow hostile groups to discover "current intelligence activities used," "criteria used—and priorities assigned to—current intelligence or counterintelligence investigations," and "targets of the intelligence activities and investigations." In addition, the declaration explained that the release of sensitive intelligence about, or from, a foreign country could injure diplomatic relations. This exception was not applied wholesale, but only to certain types of information and analysis based on that information, including: intelligence supplied by witnesses and confidential sources, information from the intelligence community, targeting information, and intelligence "intertwined with public source information."

The ACLU cross-moved for summary judgment, objecting to the FBI's refusal to release 75 maps, 25 domain intelligence notes, and 1 program assessment, and also to the redaction of material from 15 program assessments and 25 electronic communications. The ACLU argued that the withheld documents likely relied on

---

[1] A *Vaughn* index, named after *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), describes the documents responsive to a FOIA request and the exemptions employed, facilitating the adversarial process and judicial review.

publicly available racial or ethnic information and so could not be withheld (at least not in full) under the FOIA's law-enforcement and classified-intelligence exemptions. 5 U.S.C. § 552(b)(7)(A), (b)(1). Further, the ACLU surmised that the FBI had improperly relied on one of the FOIA's exclusion provisions, 5 U.S.C. § 552(c)(3), and thus failed to disclose even the existence of certain responsive records. Unlike the § 552(b) "exemptions," the § 552(c) "exclusions" permit the agency to state that "there exist no records responsive to your FOIA request," whether or not such records actually exist. Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information Act, § G.4 (Dec. 1987). When the plaintiff raises a plausible § 552(c) concern, however, the burden shifts to the agency to file a response. The standard practice of the FBI has been to file an *in camera* declaration with the district court, stating whether an exclusion has been employed and, if so, the basis for the withholding. *Ibid*. After reviewing the declaration, the district court would issue its decision without specifying whether an exclusion was used or not. The ACLU objected to the use of a sealed *in camera* response to its § 552(c) concern, instead seeking public adjudication of the issue through a "Glomar"-like procedure,[2] in which the agency would answer a hypothetical question: whether the type of information sought by the plaintiff would be excludable under § 552(c), if such records exist.

On September 30, 2012, the district court granted summary judgment to the FBI and denied the ACLU's cross-motion, upholding the FBI's use of both Exemption 7(A) and Exemption 1, among other holdings. The court found that the Hardy Declaration and the accompanying index "fairly describe[] the content of the material withheld, and adequately state[] the FBI's grounds for withholding and that those grounds are reasonable." Dist. Ct. Op. at 18. The court rejected the ACLU's public-information argument, reasoning that race and ethnicity may be "significant" to an investigation, and release of that information could alert a criminal organization that it may be the subject

---

[2] The Glomar procedure, named after the secret government ocean vessel the *Hughes Glomar Explorer* at issue in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), refers to an agency response that neither confirms nor denies the existence of requested records. An agency need not include such records in a *Vaughn* index, as long as its affidavits establish that if the records existed, a specified FOIA exemption would apply. *See Hunt v. CIA*, 981 F.2d 1116, 1118 (9th Cir. 1992); *Phillippi*, 546 F.2d at 1013.

of an investigation. The court also rejected the ACLU's proposed procedure for adjudicating § 552(c) questions, instead reviewing the *in camera* declaration of the FBI and concluding that "if an exclusion was employed, it was and remains amply justified." Dist. Ct. Op. at 20 (internal quotation marks and alterations omitted). The ACLU appeals the district court's Exemption 7(A) determination, and the use of an *ex parte*, *in camera* procedure for § 552(c) questions.[3]

## II

Under the FOIA, each "agency" upon "any request" for records shall make the records "promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless one of nine specific exemptions applies, 5 U.S.C. § 552(b)(1)–(9). In accordance with the FOIA's "dominant objective" of disclosure, these exemptions are to be "narrowly construed." *Akron Std. Div. of Eagle-Picher Indus., Inc. v. Donovan*, 780 F.2d 568, 571 (6th Cir. 1986). The district court reviews an agency's decision to deny a FOIA request de novo, with the burden on the agency to justify its withholding. 5 U.S.C. § 552(a)(4)(B). The propriety of the district court's grant of summary judgment is likewise reviewed de novo on appeal. *Rugiero v. Dep't of Justice*, 257 F.3d 534, 543 (6th Cir. 2001). Summary judgment is warranted where "the movant shows that there is no genuine dispute as to

---

[3]The ACLU appealed the district court's Exemption 1 ruling only "to the extent that it is interpreted to permit Defendants to keep secret any publicly-available racial and ethnic information." Reply Br. at 8. The FBI has stated on appeal that Exemption 1 was not invoked to withhold any public-source information, and this is supported by the record.

Under Executive Order 13,526, agencies may classify information whose "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security" and pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology" and "foreign relations or foreign activities of the United States, including confidential sources," among other subjects. Exec. Order No. 13,526 § 1.4(c), (d), 75 Fed. Reg. 707, 709 (Dec. 29, 2009). According to the Hardy Declaration, the FBI only withheld "(1) information that identifies the specific type of intelligence activity directed at a specific target and the identity of the target of national security interest; (2) identities of targets of foreign counterintelligence investigations; [] (3) the identity of intelligence sources; [and] (4) FISA derived information." These four categories of information are plainly classifiable, and do not encompass the publicly available demographic data to whose withholding the ACLU objects. So long as the FBI did not withhold other types of data, Exemption 1 was properly applied. While intelligence agencies do routinely rely on public and open-source information (also known as open-source intelligence, or OSINT), such information does not fit in any of the classification categories of Executive Order 13,526, and will not ordinarily be classified or subject to Exemption 1. *See, e.g.*, Dep't of the Army, *Open-Source Intelligence*, Army Techniques Publication No. 2-22.9, 2-9 (July 10, 2012), http://www.fas.org/irp/doddir/army/atp2-22-9.pdf (noting that final analysis of open-source information may be deemed "controlled unclassified information" or "sensitive but unclassified information").

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Most FOIA cases are decided on summary judgment, since the primary question is a legal one: whether the withheld documents are covered by one of the statutory exemptions.  *See Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012).  This is due to the "peculiar posture" of FOIA cases, in which plaintiffs, lacking access to the documents, can only challenge the application of the correct legal standard to the descriptions provided by the government, not the actual content of the underlying documents.  *Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994).  Nevertheless, to facilitate review and the adversarial process, the government must support its position with detailed affidavits and a descriptive index with "a relatively detailed analysis" of "manageable segments" of the documents.  *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).  The agency's declarations are entitled to a "presumption of good faith."  *Rugiero*, 257 F.3d at 544.  If bad faith is shown or the agency's declarations are insufficient to meet its burden, the court may seek to examine the withheld documents *in camera*.  *See* 5 U.S.C. § 552(a)(4)(B).

**A**

Exemption 7(A) permits withholding of information if the information 1) is "compiled for law enforcement purposes" and 2) its release "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  The ACLU does not dispute that the records were "compiled for law enforcement purposes"; records compiled by the FBI *per se* satisfy this requirement.  *See Jones*, 41 F.3d at 246.  As to the second requirement, the ACLU does not dispute that the information is being used in "pending or prospective" enforcement proceedings, but only that the FBI failed to show that release could reasonably be expected to cause some articulable harm.  *Manna v. Dep't of Justice*, 51 F.3d 1158, 1164 (3d Cir. 1995).  For the purposes of Exemption 7(A), the agency may show this risk of interference generically—document-by-document discussion is unnecessary.  *See Dickerson v. Dep't of Justice*, 992 F.2d 1426, 1431 (6th Cir. 1993).  Further, where disclosure of the records involves potential

harm to national security, we give substantial deference to the agency's determinations of the risk. *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 927–28 (D.C. Cir. 2003) (holding that same deference is due under Exemption 7(A), in appropriate cases, as under Exemption 1).

The ACLU argues that release of publicly available information will not interfere with investigations, especially as the ACLU "does not seek information about target identities or conduct, or any information from witness or informant statements." Appellant's Br. at 31. This argument fails for two reasons. First, the class of harms covered by Exemption 7(A) is not so narrow. Unlike Exemptions 7(B), (C), and (D), which deal with protecting the identity of specific investigation targets and confidential sources, by its plain terms Exemption 7(A) does not limit what type of "interference" may justify withholding. The FBI's declaration—that release of this information may reveal what leads the FBI is pursuing and the scope of those investigations, permitting groups to change their behavior and avoid scrutiny—amply states a type of interference covered by Exemption 7(A). Second, the ACLU mischaracterizes the information that disclosure would make public. The FBI is not attempting to keep demographic data from the census secret—which it could not, by definition—but its methods of selecting what data to analyze and the analysis of that data. Our intelligence and law-enforcement agencies are awash in a sea of data, much of it public, so a choice to focus on a particular slice of that data directly reveals a targeting priority, and indirectly reveals the methodologies and data used to make that selection. There is no way to release certain types of public information without showing the FBI selection process. For example, release of phone numbers in an FBI document, while individually publicly available in a phonebook, might reveal investigation targets or criminal networks. The internet, whether through search engines, websites, message boards, or social media profiles, provides a vast of amount of public information whose selective use may be central to confidential investigations and should not be disclosed. *See, e.g.*, Hardy Declaration, R.19-1 at Page ID# 128 (noting use of information from five public websites in domain assessment). Likewise, the analysis of the selected public source data is informed by internal FBI methodologies, priorities, and knowledge. All but data in the rawest form

will alert criminal and terrorist elements to how the FBI uses demographic information in its investigations, allowing such groups to avoid the FBI investigations.

The ACLU also contends that under FBI guidelines (and the Constitution), race or ethnicity cannot be the sole or primary grounds for investigation. This is true, but does not change the outcome. The disclosure of any significant factor involved in FBI decision-making could interfere with enforcement proceedings. As explained in FBI guidelines, race and ethnicity may be important to criminal and national-security investigations, since terrorist organizations may "live and operate primarily within a certain concentrated community of the same ethnicity," and may conduct activities through "ethnically-oriented business and other facilities." FBI, *2008 Department Internal Operating Guidelines*, § 4.3.C.2.a, R.24-2 at Page ID# 875. Revealing the FBI's racial and ethnic targeting priorities might not establish with *certainty* the existence or scope of an investigation of a particular criminal or terrorist group, but would surely raise suspicions. Indeed, the FBI's careful restrictions on the use of racial and ethnic data cuts against the ACLU: FBI policy ensures that the information is only used when relevant. *See ibid.* (permitting use of racial and ethnic information if it "will reasonably aid the analysis of potential threats and vulnerabilities" and "the communities are sufficiently concentrated and established").

The ACLU additionally argues that the FBI's assertions of harm are not entitled to deference as they lack "reasonable specificity of detail" and have been "called into question by contradictory evidence." *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982). As to "reasonable specificity," the FBI adequately described the grounds for withholding each responsive document, explaining that disclosure would reveal FBI priorities, threat assessments, and vulnerabilities. Given the detail of the declarations provided by the FBI, the district court had no need to inspect *in camera* the underlying documents in full to get a sense of the content. To the extent the ACLU challenges the FBI's conclusion that disclosure of these priorities would harm investigations, this is a matter of national security as to which the agency is owed deference.

As to "contradictory evidence," the ACLU argues that other FBI offices have released documents similar to those withheld in this case. Specifically, the New Jersey FBI released information on Hispanic demographics and the San Francisco FBI released information on Chinese and Russian demographics. In addition, in this case the FBI released a partially redacted domain assessment that noted that Michigan is "prime territory for attempted radicalization and recruitment by [Middle-Eastern and South Asian] terrorist groups" due to its "large Middle-Eastern and Muslim population." None of these releases call into question the FBI's assertions of harm. Similar information may be treated differently by different field offices, for example, where one has a pending investigation and one has a closed investigation. Further, while the racial and ethnic demographic data used by the different offices is superficially similar, the use—and sensitivity—of such data will vary depending on local conditions.[4] More importantly, if we adopted the ACLU's reasoning that disclosure of some information requires disclosure of all similar information, agencies would be discouraged from making a good-faith effort to disclose as many responsive documents as possible for fear of estoppel. *See ACLU v. Dep't of Defense*, 628 F.3d 612 (D.C. Cir. 2011). In this case, the other field office releases are only similar in that they also dealt with racial and ethnic demographic data, while the released Michigan Domain Assessment is at a high level of generality. There is no actual contradiction between those releases and the FBI's affidavits in this case. Courts have rejected the disclosure-of-some-is-disclosure-of-all argument in much closer cases. *See, e.g.*, *Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001) (disclosure of 14 photographs of Srebrenica massacre did not require release of other photos, since the additional disclosures could reveal reconnaissance imagery sources and methods); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (disclosure by CIA to Congress of presence in Dominican Republic in 1960 did not require disclosure of documents confirming or denying presence in 1956). Furthermore, according the FBI a presumption of good faith, the Detroit Field

---

[4]In some contexts, race and ethnicity are linked to crime, in others to terrorism. The closeness of these links, and the relevant level of generality of the data (e.g., all individuals of a certain national origin versus recent immigrants from an ethnic minority community in a certain country) will likewise vary.

Office's release of a document identifying a generic threat from Middle-Eastern and South-Asian terrorist groups compels a conclusion that the FBI has only withheld documents of greater specificity.

Because the FBI has adequately shown that release of racial and ethnic demographic data is reasonably likely to interfere with ongoing investigations by revealing FBI priorities and analytic methods, the district court properly applied Exemption 7(A).

**B**

The ACLU also argues that the FBI failed to meet its burden to disclose "any reasonably segregable portion[s]" of the responsive records. 5 U.S.C. § 552(b). This is simply a restatement of the Exemption 7(A) argument. Disclosing even the raw racial and demographic data on which the FBI relies would reveal targeting priorities and methodologies. Further, as this information is likely to appear in the form of processed, finished analysis products—not raw data—disclosure would reveal FBI analytic methods. Even if small sections might truly be public information that is not sensitive, the FBI's document descriptions are detailed enough to support a conclusion that the "exempt and nonexempt information are 'inextricably intertwined,' such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000). It appears, however, that the FBI *did* incur significant costs in painstakingly partially redacting over 100 pages of records, some to the point that the final document had "little information value." See, for example, the entirety of the "Details" section of a partially disclosed electronic communication:

> Attached as part of this electronic communication is a Domain Intelligence Note (DIN) [redacted] to the Detroit AOR. Included in the DIN is a background [redacted] and a detailed presentation [redacted]. Furthermore, the DIN shall include an outlook section which will identify what the division should be concerned with in the future [redacted].

The ACLU argues that partial disclosures from other field offices demonstrate that the FBI did not fully segregate releasable portions here, but as explained before, those releases are distinguishable. As the FBI's use of public-source information in itself may be protected under Exemption 7(A) and the FBI appears to have made a reasonable effort to segregate, the FBI's withholdings were proper.[5]

## III

The ACLU argues that the district court should have adopted a public procedure for adjudicating § 552(c) disputes, instead of relying on an *ex parte*, *in camera* declaration by the FBI. The FBI counters that the ACLU's novel procedure is unnecessary, and unsupported by law. We agree with the FBI, and decline to fashion a new procedure for § 552(c) issues.

Section 552(c) permits agencies to "treat [] records as not subject to the requirements of [the FOIA]" if they involve 1) a criminal investigation, disclosure of whose existence would interfere with enforcement proceedings, 2) personally identifiable records of an informant, where records from that informant are specifically sought, or 3) documents whose existence is classified. 5 U.S.C. § 552(c)(1)–(3). In contrast with the § 552(b) "exemptions," the provisions of § 552(c) are referred to as "exclusions," since the requirements of the FOIA do not apply at all. *See Benavides v. Drug Enforcement Admin.*, 968 F.2d 1243, 1248 (D.C. Cir. 1992).

Before passage of this section, agencies had to rely on the Glomar procedure, which permits agencies to refuse to confirm or deny the existence of requested records, with a public explanation of the exemption that would apply if the records existed. *Phillippi*, 546 F.2d at 1012–13. The Glomar procedure, however, was not well-suited to certain disclosure problems of law enforcement agencies. First, the FBI believed that while a Glomar response was appropriate to protect classified intelligence information, using such a response to protect "sensitive, ongoing criminal investigations" would not

---

[5]The district court did not directly rule on this issue, but the reasoning underlying its decision supports a conclusion that there were no significant amounts of nonexempt information. In any case, our review is de novo and the record amply supports the FBI's position.

be "in full compliance with the letter and spirit of the FOIA." *Hearings on the Freedom of Information Reform Act Before a Subcomm. of the H. Comm. on Gov't Operations*, 98th Cong. 906-910 (Aug. 9, 1984) (memo from FBI Director Webster to Rep. English). Second, unlike the CIA, which can use the exemption for intelligence for almost all its records, the FBI has "different exemptions that apply." *Id.* (response of FBI Director Webster). As a result, if the FBI is required to identify a specific exemption for the withholding—even hypothetically—the criminal organization or terrorist may "already have the information they want." *Ibid.* (noting such use of the FOIA as "[o]ne of the favorite ploys" of organized crime); *see also* 131 Cong. Rec. S74-02 (daily ed. Jan. 3, 1985) (statement of Sen. Leahy) ("The withholding of information on the basis of one of the enumerated exemptions can often be ineffective in avoiding the anticipated harms that would accompany disclosure because invoking the exemption itself becomes a piece of the mosaic."); Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information Act, § G.4 & n.47 (Dec. 1987) ("AG Memo"). In other words, a FOIA request may be "formulated in such a way that even the abstract acknowledgment of the existence or nonexistence of responsive records would itself be a disclosure causing harm cognizable under some FOIA exemption."[6] Dep't of Justice, *FOIA Counselor: Questions & Answers*, FOIA Update, Spring 1983 at 5, http://www.justice.gov/oip/foia_updates/Vol_IV_2/page5.htm.

In response, a bill was proposed in the Senate that added a categorical exclusion from the FOIA for "documents compiled in any lawful investigation of organized crime" for five years. *Freedom of Information Reform Act*, S. 774, 98th Cong. § 13; *see also* 131 Cong. Rec. S74-02 (daily ed. Jan. 3, 1985) (statement of Sen. Leahy) ("This bill would exclude from disclosure all documents compiled in a lawful investigation of organized crime."). Similar to the current exclusion language ("not subject to the

---

[6]This situation may arise where sensitive documents are incidentally responsive to a broad request, or where the fact that a matter is classified is itself sensitive to national security. For example, a plaintiff may request documents from the FBI on a certain criminal investigation. The case may involve potential terrorism connections, which the FBI wishes to keep secret, possibly to avoid tipping off a terrorist organization or protect a confidential source. Invoking a § 552(c)(3) exclusion publicly would reveal not only the possibility that the case involved sensitive national security matters, but also—unless the invocation was done in the most generic and conclusory fashion—details of the national security connection.

requirements of this section"), S. 774 provided that "[n]othing in this section shall be deemed applicable" to the specified documents. *Ibid*. The bill unanimously passed in the Senate, but stalled in the House. Nevertheless, a variant of the bill—containing the current text of § 552(c)—was added to and passed along with the omnibus Anti-Drug Abuse Act of 1986. Pub. L. No. 99-570, § 1801, 100 Stat. 3207 (1986).

The revised bill did not directly lay out the procedure to be used in applying § 552(c). Some of the sponsors explained that "[t]he manner in which the Federal courts will review agency refusals to acknowledge or deny the existence of records under these provisions [the § 552(c) exclusions] has already been well-established in the leading 'glomarization' case involving the CIA." 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. Kindness); *accord* 132 Cong. Rec. S14270-01 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy). Such a procedure would require creating "as complete a public record as possible," although "the district court may have to examine classified affidavits *in camera* and without participation by plaintiff's counsel." 132 Cong. Rec. H9455-05 (daily ed. Oct. 8, 1986) (statement of Rep. Kindness). The sponsors also expected that "notice of the authority to refuse to confirm the existence of requested records be included in every FOIA response by agencies permitted to exercise such authority." *Ibid*. The expectation of a blanket notice suggests the sponsors expected agencies to resort to the § 552(c) exclusions without specifically informing requesters; only if the requester actually challenged an alleged use of § 552(c) would it be necessary to resort to a public adjudication of the Glomar question.

From the start, the Department of Justice and the FBI disagreed with the characterization of the § 552(c) exclusions as "Glomar provisions," considering them a "similar, but distinctly different, nondisclosure mechanism[]." AG Memo at n.47. Because the ordinary Glomar response is not well-suited to maintaining secrecy in certain situations, the FBI extended the rationale of the Glomar response to the response itself, responding in such a way that neither confirmed nor denied the use of a § 552(c) exclusion. As a result, the standard practice of the FBI since the passage of the statute has been to avoid the standard Glomar step of publicly justifying its hypothetical

withholding under one of the FOIA exemptions, at least for certain particularly sensitive categories of information. In this practice, whenever a § 552(c) exclusion is employed, the FBI will inform the plaintiff that "there exist no records responsive to your FOIA request." AG Memo, § G.4. If "a FOIA plaintiff raises a distinct claim regarding the suspected use of an exclusion," the "government's standard litigation policy" is to "submit an *in camera* declaration addressing that claim, one way or the other." *Id.* at § G.5. The memo emphasizes that it is "critical" that this response be used regardless of whether an exclusion has actually been applied, and that the government should urge the court to issue a public decision that similarly does not reveal whether an exclusion was applied. *Ibid.* The memo exhorts agency personnel to be "extremely careful" in applying this "delicate exclusion mechanism," as any inconsistencies or patterns in the government's responses could reveal the very information sought to be protected. *Id.* at § G.4. If the court does not find the government's declaration adequate, the court may further order inspection of the underlying documents *in camera*. As public recognition of this order would reveal that an exclusion was invoked, its existence is kept secret from the plaintiff. If inspection of the underlying documents showed that the exclusion was improperly used, the FBI would be obligated to include the previously excluded documents in a *Vaughn* index, although their ultimate disclosure might be prevented under a § 552(b) exemption.

Courts that have dealt with § 552(c) exclusions have generally approved of the FBI's standard practice. *Rahim v. FBI*, No. 11-2850, – F. Supp. 2d –, 2013 WL 2393048, at *13 (E.D. La. May 31, 2013); *Mobley v. CIA*, Nos. 11-2072, 11-2073, – F. Supp. 2d –, 2013 WL 452932, at *42 (D.D.C. Feb. 7, 2013); *ACLU of N.J. v. Dep't of Justice*, No. 11-2553, 2012 WL 4660515, at *5 (D.N.J. Oct. 2, 2012); *Steinberg v. Dep't of Justice*, No. 93-2409, 1997 WL 349997, at *1 (D.D.C. June 18, 1997); *Beauman v. FBI*, No. 92-7603 (C.D. Cal. Apr. 28, 1993). Indeed, an agency's public invocation of § 552(c) may be held against it. *See Memphis Pub. Co. v. FBI*, 879 F. Supp. 2d 1, 14 (D.D.C. 2012) ("Instead, [the FBI] responded to plaintiffs' motion for summary judgment with an opposition on the public docket expressly citing the (c)(2) exclusion. In other words, this is yet another example of official, public action by the FBI that tends

to verify the informant's status and undermine the FBI's claim that . . . acknowledging existence of the records . . . would cause some harm that the exemptions were designed to prevent."). It is clear, however, that while the agency may deny the existence of responsive documents to the plaintiff, in no case may the agency conceal this information from the court. *Islamic Shura Council of S. Cal.*, 779 F. Supp. 2d 1114, 1124–25 (C.D. Cal. 2011).

In only one narrow context have courts engaged in public review of the use of a § 552(c) exclusion: with respect to subsection (2), dealing with an informant's records after "official confirmation" of that informant. *See, e.g.*, *Pickard v. Dep't of Justice*, 653 F.3d 782, 788 (9th Cir. 2011); *Benavides v. Drug Enforcement Admin.*, 968 F.2d 1243, 1248 (D.C. Cir. 1992). Subsection (2) provides that the exclusion applies "unless the informant's status as an informant has been officially confirmed." 5 U.S.C. § 552(c)(2). In interpreting this provision, courts have concluded that Congress intended that agencies must acknowledge the existence of documents responsive to a request about an "officially confirmed" informant, although ultimately disclosure may be precluded by Exemptions 7(C) or 7(D). *See Benavides*, 968 F.2d at 1248. Here the ACLU invokes subsection (3), which deals with classified information. The only caveat in that subsection is that the "records remain[] classified information." 5 U.S.C. § 552(c)(3). In theory, a public adversarial proceeding could be conducted over whether certain hypothesized information remains classified. But here the ACLU has not suggested that any excluded materials have been declassified, and thus a public proceeding on this matter is unnecessary.

In the FOIA context, it is well established that *in camera* review by the district court of sensitive national security matters strikes the appropriate balance of protecting the secret while providing meaningful judicial review. *See Jabara v. Webster*, 691 F.2d 272, 274 (6th Cir. 1982); *see also Phillippi*, 546 F.2d at 1013–14 ("It is clear that the FOIA contemplates that the court will resolve fundamental issues in contested cases on the basis of *in camera* examinations of the relevant documents."); *Patterson v. FBI*, 893 F.2d 595, 599 (3d Cir. 1990) ("If, however, the agency is unable to articulate

publicly the specific disclosure it fears and the specific harm that would ensue, then *in camera* inspection of a more detailed affidavit must be resorted to.") (internal quotation marks omitted).  However, the ACLU argues that the review by an independent district judge is not sufficient, proposing a public adversarial proceeding to adjudicate § 552(c) disputes.  The problem is, the ACLU's procedure is neither workable nor protective of government secrets, and would provide less effective review than does the district judge's *in camera* review.

Under the ACLU's procedure, the parties would litigate a hypothetical question: whether the type of information sought by the plaintiff would be excludable under § 552(c), if such records exist.  In most cases, this litigation will consist of little more than speculation by the plaintiff that the agency is not following the requirements of § 552(c), and the agency conclusorily responding that its search for and processing of records does follow the requirements.  In such a case, only the district court, through *in camera* inspection, could judge the merits of the agency's response.  More imaginative plaintiffs might make more specific challenges, positing the existence of a certain class of documents and arguing that they should not be excluded.  This would ordinarily be a difficult exercise—it is hard to know what types of secrets the government is concealing—and plaintiffs may need to propose many different kinds of potentially withheld information.  The government is then tasked with responding to these shots in the dark, a strange and difficult task given that few are likely to be tethered to reality, and fashioning a response is fraught with concerns of accidentally disclosing the existence or nonexistence of secret information.  Only if, as in the "official confirmation" cases, there is a narrow basis for the plaintiff's concern and the hypothetical can be readily resolved on a categorical basis, might public litigation on the point be warranted (although the agency's response might still need to be submitted *in camera*).  In this case, however, the ACLU has not even proposed a plausible category of information that the FBI has withheld.  Open-ended hypothetical questions are not well suited to the litigation process, and the alternative procedure—*in camera* review of the actual basis for withholding (if any)—more directly serves the FOIA's goals of public disclosure and independent review.  As a final note, since the *in camera*

declaration of the agency is also available to the appellate court, as it is in this case, the ACLU's contention that the appellate court cannot provide meaningful review is without merit.

On review of the agency's declaration, we conclude that the district court did not err in finding that if an exclusion was employed, it was and remains amply justified.

**IV**

For the foregoing reasons, the judgment of the district court is AFFIRMED.