**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4345
_____

AMERICAN CIVIL LIBERTIES UNION OF NEW
JERSEY,
                                        Appellant

v.

FEDERAL BUREAU OF INVESTIGATION;
DEPARTMENT OF JUSTICE
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 2-11-cv-02553
District Judge: The Honorable Esther Salas

Argued September 10, 2013

Before: SMITH, SLOVITER, and ROTH, *Circuit Judges*


1

(Filed: October 23, 2013)

Nusrat J. Choudhury      [ARGUED]
Hina Shamsi
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY  10004
     *Counsel for Appellant*

Matthew M. Collette
Catherine H. Dorsey      [ARGUED]
United States Department of Justice
Civil Division
Room 7212
950 Pennsylvania Avenue, N.W.
Washington, DC  20530

Deanna L. Durrett
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 7130
Washington, DC  20530
     *Counsel for Appellee*

_____

OPINION
_____

SMITH, *Circuit Judge.*

This appeal concerns the Federal Bureau of Investigation's ("FBI") response to appellant American Civil Liberties Union's ("ACLU") request for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2009). The ACLU claims that the United States District Court for the District of New Jersey ("District Court") erred in allowing the FBI to withhold 284 pages of responsive material pursuant to certain exemptions under the FOIA. The ACLU also challenges the *in camera* procedure employed by the District Court for determining whether the FBI's reliance on the FOIA's exclusion provision was justified, if such reliance in fact occurred, and urges us to remand to employ a "Glomar-like" procedure instead. For the reasons that follow, we will affirm the judgment of the District Court and decline to adopt the ACLU's novel proposal.

I.

In the wake of September 11, 2001, there have been efforts to restructure the FBI as the "domestic equivalent" of the Central Intelligence Agency. *See* The 9/11 Comm'n, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* 399 (2004). Part of this restructuring has involved an overhaul of the FBI's

longstanding internal guidelines in the form of a revised manual known as the Domestic Investigations and Operations Guide ("DIOG") released by the Attorney General of the United States in 2008. FBI, Domestic Investigations and Operations Guide (Dec. 16, 2008). Among other things, the DIOG authorizes FBI agents to engage in limited racial and ethnic profiling when conducting proactive assessments of criminal and terrorist threats. *Id.* at 17. Specifically, the DIOG allows FBI agents to identify and map "locations of concentrated ethnic communities" if doing so would "reasonably aid the analysis of potential threats and vulnerabilities" and "assist domain awareness for the purpose of performing intelligence analysis." *Id.* The DIOG also allows the FBI to collect and map data related to "[f]ocused behavioral characteristics reasonably believed to be associated with a particular criminal or terrorist element of an ethnic community." *Id.* at 44.

Prompted by a concern that the new DIOG would encourage unlawful racial profiling, the ACLU launched an initiative entitled "Mapping the FBI" that included a series of coordinated FOIA requests seeking records related to the FBI's use of ethnic and racial data. Am. Civil Liberties Union, Mapping the FBI: Uncovering Abusive Surveillance and Racial Profiling, Am. Civil Liberties Union (Sept. 26, 2013), http://www.aclu.org/mapping-fbi-uncovering-abusive-surveillance-and-racial-profiling. One such request

4

targeted six FBI field offices in New Jersey and sought information "concerning the FBI's implementation of its authority to collect information about and 'map' racial and ethnic demographics, 'behaviors,' and 'life style characteristics' in local communities."

In response, the FBI searched its files and identified 782 pages of potentially responsive records. Of these, the FBI eventually released 312 pages (some of which were partially redacted),[1] withheld 186 pages as duplicative, and, most importantly for our purposes, withheld 284 pages as exempt from disclosure. The withheld records included ten Domain Intelligence Notes ("DINs"), a 2009 Newark Annual Baseline Domain Assessment ("Domain Assessment"), an Electronic Communication from October 30, 2009 ("2009 EC"), and five Newark Domain Management Team Maps ("Maps").

Unsatisfied with this response, the ACLU, after exhausting its administrative remedies, filed suit against the FBI and the Department of Justice ("DOJ") in the District Court for the District of New Jersey, seeking an injunction for release of the withheld records. On December 12, 2011, the FBI and DOJ moved for summary judgment, contending that the withheld

---

[1] The FBI's first release on December 22, 2010 consisted of 298 pages. The FBI released an additional 14 pages on June 20, 2011 and an additional six pages on February 22, 2012.

documents were exempted from disclosure under 5 U.S.C. §§ 552(b)(1) ("Exemption 1"), (b)(7)(A) ("Exemption 7A"), (b)(7)(C) ("Exemption 7C"), (b)(7)(D) ("Exemption 7D"), and (b)(7)(E) ("Exemption 7E").[2]  In support of this motion, the FBI submitted declarations by David Hardy, the Section Chief of the FBI Record/Information Dissemination Section ("Hardy Declarations") that describe in detail each piece of information withheld and explain why it was exempted from disclosure under the FOIA, as well as a "*Vaughn* index"[3] that conveys similar information in table format.

On January 20, 2012, the ACLU filed a cross-motion for summary judgment.  The ACLU argued that the FBI failed to demonstrate that it had segregated and disclosed all non-exempt material from the withheld documents and that the FBI's explanations for withholding certain documents were insufficiently detailed.  Additionally, the ACLU sought a court order requiring the FBI to submit an *in camera* declaration explaining whether it had relied on 5 U.S.C. § 552(c) (the FOIA's "Exclusion Provision") to withhold additional, unidentified records, and the justification for this

---

[2] The DOJ and FBI also moved to dismiss the FBI on the theory that the FBI is not an "agency" under 5 U.S.C. § 552. The District Court granted this motion, noting only that "[w]here the DOJ is already a named defendant in a FOIA case, dismissing the FBI has no legal effect."

[3] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

exclusion if it occurred. The FBI submitted such a declaration on February 9, 2012.

The FBI released six additional pages on February 22, 2012 and moved for summary judgment with respect to these pages on March 16, 2012. On April 2, 2012, the ACLU again submitted a cross-motion for summary judgment, but at that point argued that "as briefing ha[d] progressed, it ha[d] become clear" that the *in camera* procedure it had originally requested on the Section 552(c) issue was inadequate and urged the District Court to adopt a procedure "akin to the Glomar procedure established by the D.C. Circuit in *Phillippi v. CIA*, 946 F.2d 1009 (D.C. Cir. 1976)."

On October 2, 2012, the District Court granted summary judgment for the FBI. The District Court held that the withheld documents were exempted under Exemptions 1, 7A, 7C, 7D, and 7E, and that the FBI had satisfied its burden of demonstrating that none of the withheld information could be segregated and disclosed. The District Court also held, without confirming or denying the FBI's reliance on FOIA's Exclusion Provision, that "if an exclusion was invoked, it was and remains amply justified." The District Court based this conclusion on the FBI's *in camera* declaration originally requested by the ACLU and declined to address the ACLU's argument for adopting the Glomar-like procedure. The ACLU timely appealed.

7

## II.

We first address the District Court's ruling on the FBI's motion for summary judgment. The District Court had jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B), 28 U.S.C. § 1331, and 5 U.S.C. §§ 701-706 and we exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. Due to the "unique configuration" of summary judgment in a FOIA case, in which "the opposing party (generally the requester) does not ordinarily have the factual information upon which the moving party (generally the agency) has relied," this Circuit has held that "the familiar standard of appellate review promulgated by Federal Rule of Civil Procedure 56(c) does not apply." *McDonnell v. United States*, 4. F.3d 1227, 1241-42 (3d Cir. 1993). Instead, "[w]e employ a two-tiered test" under which we first determine "whether the district court had an adequate factual basis for its determination" and, if we find such a basis, "must then decide whether that determination was clearly erroneous." *Abdelfattah v. United States Dept. of Homeland Sec.*, 488 F.3d 178, 182 (3d Cir. 2007). Because we conclude that ample evidence supported the District Court's conclusion that the FBI satisfied its burden under Exemption 7A, we will affirm. Accordingly, we need not decide whether the FBI's

8

reliance on Exemption 1 or Exemption 7(E) was proper.[4]

A.

The FOIA requires any "agency," upon "any request," to make records "promptly available to any person." 28 U.S.C. § 552(a)(3)(A). The purpose of this requirement is "to facilitate public access to Government documents," and therefore its "dominant objective" is "disclosure, not secrecy." *Sheet Metal Workers Int'l Ass'n, Local Union No. 19 v. United States Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998) (internal quotation marks and citations omitted). Because "[p]ublic access to government information is not . . . all encompassing," however, the FOIA "exempt[s] nine categories of documents from [its] broad disclosure requirements." *Id.* (internal quotation marks and citations omitted).

The dispositive exemption in this case is Exemption 7A, which authorizes the withholding of "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." § 552(b)(7)(A). "The agency bears the burden of justifying the withholding, and the [district] court

---

[4] The ACLU does not appeal the District Court's rulings on Exemptions 7C or 7D.

9

reviews the agency claims of exemption *de novo*." *OSHA Data/CIH Inc. v. United States Dep't of Labor*, 220 F.3d 153, 160 (3d Cir. 2000). This burden may be satisfied by affidavits that describe the material withheld and why that material falls under a particular exemption. *McDonnell*, 4 F.3d at 1241. An agency is entitled to summary judgment when these affidavits "describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption . . . , and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Davin v. United States Dep't of Justice*, 60 F.3d 1043, 1050 (3d Cir. 1995).

Here, the ACLU does not contest that the information withheld by the FBI was "compiled for law enforcement purposes" and argues only that the FBI has not demonstrated that production of this information could "reasonably be expected to interfere with enforcement proceedings." The ACLU acknowledges that when, as in this case, the disclosure of requested information poses risks to national security, an agency's assessment of this risk is afforded substantial deference. *See Ctr. For Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 927-28 (D.C. Cir. 2003). Nevertheless, the ACLU argues that the FBI is not entitled to summary judgment because its assertions that disclosure would disrupt enforcement proceedings are not "reasonably

10

specific" and are "called into question by contradictory evidence."

## B.

We reject the ACLU's argument that the FBI's release of similar racial/ethnic data in response to this or similar FOIA requests contradicts its assertion that release of the data withheld here would be harmful.[5] The Hardy Declarations explain that "each office faces different threats in each domain" and "[i]f similar information was released in another location, it was based on a decision specific to that domain and the relevance of the information to that domain." Common sense itself suggests that different data related to different ethnic populations in different cities used in completely different FBI investigations can vary greatly in sensitivity. Further, we share the concern expressed by the Sixth Circuit in a related case that "if we adopted the

---

[5] Specifically, the ACLU cites to (1) the FBI's partial release of DIN #9 in this case, which concerned an investigation of the MS-13 gang and contained data on various Hispanic communities in Newark, New Jersey, (2) a Michigan field office's release of a memorandum concerning an investigation of international terrorist groups that contained data on "Middle-Eastern and Muslim population[s]" in Michigan, and (3) a San Francisco field office's release of a similar memorandum concerning an investigation of Chinese and Russian organized crime syndicates that contained data on Chinese and Russian populations in that area.

11

ACLU's reasoning . . . , agencies would be discouraged from making a good-faith effort to disclose as many responsive documents as possible for fear of estoppel." *Am. Civil Liberties Union of Michigan v. F.B.I.*, 12-2536, 2013 WL 4436533 at *5 (6th Cir. Aug. 21, 2013).

We also disagree with the ACLU that the Hardy Declarations lack reasonable specificity when describing the risk of harm from disclosure. The Hardy Declarations provide a section-by-section description of each of the withheld documents.[6] The Hardy Declarations also explain exactly how disclosure of the requested ethnic and demographic data in each withheld document would interfere with enforcement proceedings: by revealing the target or focus of the FBI's investigatory efforts. J.A. 127 (for DIN #1); J.A. 129 (for DIN #2); J.A. 130-31 (for DIN #3); J.A. 132 (for DIN #4); J.A. 134 (for DIN #5); J.A. 135 (for DIN #6); J.A. 137 (for DIN #7); J.A. 138 (for DIN #8); J.A. 140 (for DIN #10); J.A. 141 (for DIN #11); J.A. 907-08 (for Domain Assessment and 2009 EC); J.A. 910-11 (for Maps). Of course, once these targets were alerted to the existence or exact focus of these investigations, they would likely "change their behavior and/or the 'players' to avoid

---

[6] For example, the description of DIN #1 reveals the date and the subject line of the document and outlines the document paragraph by paragraph ("summary paragraph," "scope section," "background section," "judgments section," "details section").

12

detection and/or further investigation." It is hard to imagine how the FBI could provide a more detailed justification for withholding information under this exemption without compromising the very information it sought to protect.

We further disagree with the ACLU that release of the "limited public source information" that it seeks "cannot reasonably be expected to tip off targets or permit them to circumvent investigations." The ACLU first contends that such disclosure would not be harmful because the "information sought is public to begin with." This argument misses the obvious point that while the demographic data itself may be public, its use by the FBI is certainly not. The Hardy Declarations reveal what should be obvious to anyone: that the harm from disclosure lies in revealing, indirectly, the FBI's targeting preferences and investigative techniques—not in revealing demographic information that is already available to the public. The ACLU further argues that such disclosure would not be harmful because the FBI is prohibited from using race or ethnicity as a "dominant or primary factor" in its investigations. We reject this argument as it rests on the implausible assumption that only disclosure of a "dominant or primary factor" could impede an FBI investigation.

Accordingly, we hold that the FBI has satisfied its burden under Exemption 7A with respect to all of the

13

withheld information.[7]    We need not, then, address whether the FBI has satisfied its burden under Exemption 1 or Exemption 7E with respect to various subsets of this information.

## III.

We next address the ACLU's argument that this case should be remanded to apply its proposed "Glomar-like" procedure to the Section 552(c) issue—i.e. whether, *if* the FBI withheld responsive documents pursuant to FOIA's exclusion provision, such withholding was proper.    The ACLU proposed this procedure after they had already proposed—and the District Court had already conducted—an *in camera* review of the Section 552(c) issue.    The District Court declined to adopt the ACLU's "Glomar-like" procedure, and we review this decision for abuse of discretion.    *See Larson v. Dep't of State*, 565 F.3d 857, 859 (D.C. Cir. 2009) (reviewing for abuse of discretion district court's decision *not* to conduct *in camera* review); *In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000) (reviewing for abuse of discretion district court's decision to rely on *ex parte* government affidavit in determining that crime-fraud

---

[7] Because we hold that the public source information sought by the ACLU is itself exempted from disclosure under Exemption 7A, we need not address the ACLU's argument that the FBI failed to disclose all "reasonably segregable" non-exempt responsive information.

14

exception applies to attorney-client communications). We hold that no abuse of discretion occurred.[8]

## A.

The ACLU's proposed procedure is modeled after the procedure developed in *Phillippi v. C.I.A.*, 564 F.2d 1009 (D.C. Cir. 1976), later known as the "Glomar response," which allowed the Government to "neither confirm nor deny" the use of one of FOIA's exemptions prior to the enactment of Section 552(c). *See Am. Civil Liberties Union of Michigan*, 2013 WL 4436533, at *7. When issuing a "Glomar response," the Government is required to "provide a public affidavit explaining in as much detail as possible the basis" for its ability to issue such a response. *Phillippi*, 564 F.3d at 1013. Under this procedure, the Government's explanation is to be reviewed *in camera* only as a last resort. *See id.* The ACLU proposes that this "Glomar procedure" be adapted

---

[8] The ACLU cites *McDonnell*, 4 F.3d at 1242, for the proposition that the District Court's "method for adjudicating the Section 552(c) claim" should be reviewed *de novo*. The only language in this case that could arguably support this argument refers to "plenary review of issues of law." *Id.* We find *Larson v. Dep't of State*, 565 F.3d 857, 859 (D.C. Cir. 2009) and *In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000) to more directly address the issue of standard of review in these circumstances, and hold that an abuse of discretion should apply.

to the Section 552(c) context to operate as follows:

> [T]he Court [would] require Defendants to respond to Plaintiff's concern that they may have relied upon Section 552(c) with . . . a public court filing indicating that Defendants interpret all or part of Plaintiff's FOIA request as seeking records that, if they exist, would be excludable under Section 552(c), and that therefore, the Defendants have not processed those portions of the Request . . . . Plaintiff could then brief . . . its argument that the types of records sought, if they exist, would not fall within the exclusion.  The Court could then determine . . . whether the type of information sought by Plaintiff, if it exists, is excludable under Section 552(c).

J.A. 1019-20.  The ACLU argues that adoption of this procedure would permit more meaningful judicial review and better protect the interests of the litigants and the public.  We disagree, and hold that the District Court did not abuse its discretion by conducting an *in camera* review.

## B.

District Courts have long enjoyed the discretion to employ *in camera* procedures in other circumstances

16

involving sensitive information. *See, e.g.*, *United States v. Zolin*, 491 U.S. 554, 564 (1989) (upholding "*in camera* review of allegedly privileged communications to determine whether those communications fall within the crime-fraud exception" to attorney-client privilege); *In re Grand Jury Subpoena*, 223 F.3d 213, 216 (3d Cir. 2000) ("If the district court decides that the government should present information [to justify a grand jury subpoena] beyond the minimal . . . requirements, it may use *in camera* proceedings or *ex parte* affidavits to preserve grand jury secrecy, a procedure we have consistently endorsed.").

Nothing in the FOIA operates to limit this discretion. In fact, the FOIA explicitly contemplates *in camera* review in the exemption context. 5 U.S.C. § 552(a)(4)(B) (providing that the District Court "may examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions."). Though the ACLU argues that Section 552(c)'s legislative history evidences an intent to incorporate a "Glomar-like procedure," we find that this evidence is inconclusive at best.[9]

---

[9] The ACLU cites two nearly identical statements by sponsoring representatives that describe the purpose of Section 552(c) as codifying the Government's authority to neither confirm nor deny the existence of certain records that

Since passage of Section 552(c), it has been the Government's "standard litigation policy" to respond to a FOIA plaintiff's suspicions that an exclusion was used with "an *in camera* declaration addressing this claim, one way or another." Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information Act, § G.4 & n.47 (Dec. 1987). The courts that have addressed this practice have generally approved. *See, e.g., Am. Civil Liberties Union of Michigan*, 2013 WL 4436533, at *10 (approving of procedure and collecting cases).[10] In short, we find no legal authority compelling the District Court to employ the ACLU's proposed

had been provided in *Phillippi*, 546 F.2d at 1012. To the extent we consider these statements to be evidence of legislative intent, we note that they only purport to incorporate from *Phillippi* the Government's authority to neither confirm nor deny the existence of records, not the obligation to publicly justify such a response.

[10] The Sixth Circuit in *Am. Civil Liberties Union of Michigan* notes that "[i]n only one narrow context have courts engaged in public review of the use of a § 552(c) exclusion: with respect to subsection (2), dealing with an informant's records after official confirmation of that informant." 2013 WL 4436533, at *9 (collecting cases). The ACLU does not suggest in this case that the FBI is excluding information related to an officially confirmed informant, or any other information that is ineligible for exclusion due to public exposure. *Cf. id.* ("[T]he ACLU has not suggested that any excluded materials have been declassified, and thus a public proceeding on this matter is unnecessary.").

18

procedure.

Nor are we convinced that adopting the ACLU's proposed procedure would be wise from a policy perspective. In a recent related decision, the Sixth Circuit explained that this procedure would do little to facilitate judicial review:

> Under the ACLU's procedure, the parties would litigate a hypothetical question: whether the type of information sought by the plaintiff would be excludable under § 552(c), if such records exist. In most cases, this litigation will consist of little more than speculation by the plaintiff that the agency is not following the requirements of § 552(c), and the agency conclusorily responding that its search for and processing of records does follow the requirements. In such a case, only the district court, through *in camera* inspection, could judge the merits of the agency's response. More imaginative plaintiffs might make more specific challenges, positing the existence of a certain class of documents and arguing that they should not be excluded. This would ordinarily be a difficult exercise—it is hard to know what types of secrets the government is concealing—and plaintiffs may need to propose many different kinds of

19

potentially withheld information. The government is then tasked with responding to these shots in the dark, a strange and difficult task given that few are likely to be tethered to reality, and fashioning a response is fraught with concerns of accidentally disclosing the existence or nonexistence of secret information.

*Am. Civil Liberties Union of Michigan*, 2013 WL 4436533, at *10. By contrast, the *in camera* procedure employed by the District Court allows it to examine the actual information withheld if and when it is actually withheld. In this way, an *in camera* procedure provides for *more* meaningful judicial review than does the "Glomar-like" method of adjudicating "[o]pen ended hypothetical questions," which "are not well suited to the litigation process." *Id.* Further, a district court's use of an *in camera* procedure does not hinder review on appeal, because appellate courts can also employ this procedure, as we have done in this case.

On review of the agency's *in camera* declaration, we conclude that the District Court did not err in concluding that if an exclusion was employed, it was and remains amply justified.

IV

For the foregoing reasons, we will AFFIRM

20

the judgment of the District Court.